UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| J.C.,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>SOCIETY OF JESUS, OREGON PROVINCE,<br><br>　　　　　Defendant. | CASE NO. C05-1662JLR<br><br>ORDER |

## I. INTRODUCTION

This matter comes before the court on Plaintiff J.C.'s motion for discovery sanctions (Dkt. # 102) against Defendant, the Oregon Province of the Society of Jesus ("the Province"), and a third party, Seattle University ("SU"). The court has reviewed the parties' briefs and declarations, and finds oral argument unnecessary. For the reasons stated below, the court GRANTS the motion in part and DENIES it in part.

## II. BACKGROUND

The Province all but concedes that on one occasion in 1968, one of its priests, Father Michael Toulouse, sexually abused J.C. at SU's Jesuit residence. J.C. was twelve years old at the time. The key questions in this action are whether the Province knew that Father Toulouse was a danger to children in 1968, and whether it should have acted to protect J.C. The instant motion focuses on allegations that both the Province and SU

ORDER – 1

have engaged in discovery misconduct to obscure the truth about the Province's knowledge regarding Father Toulouse.

Although J.C. brought his request for relief as a single motion, the allegations against the Province are unrelated to the allegations against SU. The court will therefore address the allegations against each entity separately.

### III.  DISCUSSION

**A.     Allegations of Misconduct Against the Province**

**1.     Evidence of Father Toulouse's Misconduct in the Early 1950s**

Until recently, the Province steadfastly denied knowledge of the threat Father Toulouse posed and a duty to protect J.C. Last week, the court permitted the Province to amend its answer to admit that, prior to 1968, some Provincial priests knew that Father Toulouse had sexual contact with a minor. See Oct. 20, 2006 Order (Dkt. # 124).

The Province amended its answer after its September 11, 2006, production of the minutes of a 1951 meeting of the "Consultors," a group of senior priests who convened to address matters of concern to the Province. The document (the "1951 Minutes") reveals that the Consultors addressed an admitted instance of sexual contact between Father Toulouse and an unnamed minor:

> Fr. Michael Toulouse permitted a school boy to attempt intimacies for a moment while himself half drowsy abed. Awakening fully he sharply rebuffed the boy, and expelled him from the room, then came very openly to the Provincial confessing his partial fault.
>
> Question: Should his case be referred to Rome. [sic]
>
> Ans. All consultors negatively. Handle it here.

Shaffer Decl.[1], Ex. J.

---

[1] The court cites the declaration (Dkt. # 99) that J.C.'s counsel, Michael Shaffer, filed in support of his opposition to a summary judgment motion that the court has already resolved. The court addresses the Province's motion to seal exhibits to the declaration in Part III.C, infra.

ORDER – 2

In addition, the Province produced minutes of a 1938 meeting at which the Consultors discussed Father Toulouse, who had not yet become a priest:

> Mr. M. Toulouse: Does not seem to understand the meaning of obedience. Has no trouble with the second vow. Does not observe religious discipline, although often warned by his Fr. Rector. He has asked to leave, but now wishes another trial. All Consultors and Fr. Provincial feel that he should leave.

Shaffer Decl., Ex. A.

The Province's September 2006 production also included documents revealing sexual abuse allegations against another of its priests, Father John Leary, during the time he served as President of Gonzaga University in Spokane in the 1960s.

Although the September 2006 production of the 1951 Minutes appears to have spurred the Province to amend its answer, J.C. already had direct evidence that Provincial priests knew that Father Toulouse had sexually abused children prior to 1968. Through earlier discovery, J.C. learned of J.M., a man who Father Toulouse abused repeatedly in the early 1950s while J.M. was an altar server at Gonzaga High School in Spokane. Decl. of J.M. ¶ 3. On an undisclosed date[2], J.M. told his father about the abuse. Id. ¶ 6. His father took a pistol to the high school grounds to confront Father Toulouse. Id. ¶ 7. Another priest, Father Prange, saw J.M.'s father brandishing the pistol and convinced him to meet with him and Father Corkery, the Gonzaga President. Id. J.M's father threatened to kill Father Toulouse. Id. ¶ 7. At some point thereafter, Father Toulouse left Gonzaga High School for SU. Id. In 2004, the Province paid J.M. to settle his claims. Id. ¶ 11.

Even before the Province produced the 1951 Minutes, J.C. had Provincial documents hinting at problems with Father Toulouse. For example, a November 1950 letter from Father Harold Small to another priest in the Province states as follows:

---

[2]Although J.M. states that he attended Gonzaga High School from 1950 to 1954, his declaration is silent as to the dates on which the events he describes occurred.

ORDER – 3

> I am debating with myself whether to discuss the case of Fr. Toulouse with the Consultors. I do not wish to report it to Rome for it seems to me that it was not fully deliberate. He prefers not to go back into high school, much as he likes to teach there. So I am doubtful that a man can be obtained to take Father's place at [Gonzaga High School].

Shaffer Decl., Ex. I.

At some point after Father Small wrote his letter, the Province moved Father Toulouse from Gonzaga High School to the philosophy department at SU. Father Albert Lemieux, then the SU President, wrote a letter stating that he was "very disappointed" that the Province had transferred Father Toulouse to SU:

> I had understood that Fr. Toulouse was coming here not as a substitute for anyone but because he had to be got out of Spokane. Whatever may be Father Toulouse's ability, I just wonder if philosophy is the proper place for him.

Shaffer Decl. Ex. C.

The 1951 Minutes, J.M.'s allegations, and the Provincial documents discussing the need to move Father Toulouse from Spokane to Seattle are evidence that some priests within the Province knew before 1968 that Father Toulouse was a danger to children.

**2.    J.C.'s Request for Sanctions Against the Province**

J.C. moves for severe sanctions because he alleges that the Province withheld discovery, lied regarding its prior knowledge of Father Toulouse's sexual misconduct, and concealed vital information. Among other things, he requests an award of attorneys' fees and costs for all discovery and settlement negotiations that his counsel have engaged in to date, an order striking the Province's defenses from its answer, an order permitting him to engage in discovery regarding the alleged withholding of documents, and an order requiring the Province's counsel to appear before the court for an inquisition. Mot. at 2-3.

ORDER – 4

J.C.'s allegations[3] are, at best, conjecture. His request for sanctions against the Province based on those allegations is a waste of counsel's efforts and the court's resources. There is no basis for the sanctions J.C. seeks. The only close question before the court is whether to sanction J.C. (or his counsel) for bringing this motion.

In concluding that J.C.'s claims of discovery abuse lack merit, the court begins with his facially preposterous allegation that the Province violated a court order by failing to produce the 1951 Minutes sooner. J.C. filed motions in July 2006 to compel discovery on several topics. At the time, the Province had consistently represented to J.C. and the court that it had produced all documents relating to Father Toulouse. J.C. was apparently satisfied with those representations, because he did not ask for additional documents describing Father Toulouse's misconduct. Instead, he sought discovery of documents related to allegations of sexual misconduct against *other priests* within the Province.

At an August 9, 2006, hearing, the court found that the documents J.C. sought were relevant to the Province's notice of sexual misconduct by other priests, and therefore relevant to whether the Province had reason to give heightened scrutiny to complaints regarding Father Toulouse. The court ordered the Province to produce documents showing its knowledge, prior to 1969, of allegations of abuse against any of its priests (Dkt. # 78). Counsel for the Province emphasized that the search for such documents would be difficult and time-consuming. J.C. did not ask the court to set a deadline for the Province's production of documents, and the court did not impose one.

On August 31, 2006, the parties contacted the court to request a teleconference to address several discovery issues. The court held a teleconference on September 6, 2006. By that time, the Province had not yet produced documents related to its pre-1969 notice

---

[3]The court notes the likelihood that "J.C.'s allegations" regarding the Province's conduct during discovery are, in reality, the allegations of his counsel.

ORDER – 5

of sexual abuse by its priests, but stated that it would complete production by September 11, 2006.[4] At the teleconference, J.C.'s counsel did not argue that the Province had unreasonably delayed in producing such documents. Indeed, the evidence indicated then, as it indicates now, that the parties cooperated reasonably to complete the production of documents in a timely fashion.

On September 11, 2006, the Province produced a small collection of documents that included the 1951 Minutes. The Province complied fully with the court's orders. J.C.'s allegations to the contrary are baseless and irresponsible.

In addition to his specious allegations of violations of court orders, J.C. asserts that the 1951 Minutes show that the Province lied about is knowledge of Father Toulouse's misconduct. The Province long ago disclosed that it paid J.M. in a 2004 settlement of his claims that Father Toulouse abused him. J.C. now surmises that because the Province paid J.M. after conducting little investigation of his claims, the Province "evidently knew that JM was the boy from Spokane who was referenced in the 1951 minutes." Mot. at 7.

The Province proffers a different explanation for its settlement with J.M. Father John Whitney, the head of the Province, states that he settled with J.M. (and other victims of abuse) after listening to their allegations and finding them to be credible. Decl. of Father John Whitney ¶ 11. Indeed, the Province attempted to enter such a settlement with J.C. before he filed this lawsuit. Father Whitney states that he had no knowledge of the 1951 Minutes until the Province found them recently. Id. ¶ 15.

---

[4] The Province's counsel did not state, during the September 6 teleconference, that the Province would issue a press release late on Friday, September 9, regarding the documents that describe sexual abuse by Father Leary in the 1960s. This raises the inference that the Province did not request a September 11 disclosure deadline merely to accommodate a thorough search for documents, but also to assist the Province's public relations. The Province's conduct calls its credibility into question. The court cautions all parties that they will face consequences if they employ court proceedings to advance their media campaigns.

ORDER – 6

Although J.C. is free to doubt the sincerity of the Province's credulous approach to people who claim sexual abuse at the hands of its priests, his allegation that knowledge of the 1951 Minutes motivated the Province to settle with J.M. in 2004 is untethered speculation.  Even standing alone, J.C.'s allegation is a wild guess.  In light of evidence that the Province discovered the 1951 Minutes only recently, and only after a diligent search for responsive documents[5], it is a wild guess that is contrary to the evidence of record.  There is no evidence that any living current or former member of the Province was aware of the 1951 Minutes until recently.

Unable to provide any evidence that the Province knowingly concealed the 1951 Minutes, J.C. alleges that the Province at least knew that the Consultors met regularly to discuss allegations of sexual abuse against its members, and that it should have disclosed minutes of such meetings much sooner.  Again, there is no evidence to support this allegation.  The available evidence suggests not only that the Consultors consider sexual misconduct issues sporadically at best, but also that no current members of the Province had reason to expect that minutes of Consultors' meetings existed.  Moreover, the evidence demonstrates a lack of diligence on J.C.'s part in requesting documentation of Consultors' meetings.  J.C. and his counsel have long been aware of Father Small's November 1950 letter stating that he was considering discussing Father Toulouse with the Consultors.  Armed with such knowledge, the court would expect J.C. to have served discovery requests asking for evidence of the activities of the Consultors.  There is no

---

[5]Charles Duffy, a Provincial employee, provided a declaration describing the Province's search for documents responsive to the court's August 9, 2006 order.  He found the 1951 Minutes during that process.  Duffy Decl. ¶¶ 3-7.  Had J.C.'s counsel contacted the Province's counsel before moving for sanctions, they could have at least considered whether to credit Mr. Duffy's explanation.  Alternatively, counsel could have considered whether the court would find their groundless speculation about the provenance of the 1951 Minutes more compelling than the Province's *evidence* regarding the issue.

ORDER – 7

evidence that J.C. did so, and thus there is no basis for the allegation that the Province concealed its knowledge about the Consultors. Indeed, only the diligence of the Province in responding to J.C.'s broader discovery requests revealed the existence of decades-old minutes of Consultor meetings.

J.C. lobs other accusations of misconduct. His motion is teeming with such allegations, but void of evidence to support them. For example, J.C. writes that the 1951 Minutes "show the [Province] covered up for Toulouse by moving him to Seattle after he sodomized a boy at the Jesuit residence hall in Spokane, and decided not to seek Toulouse's expulsion from the Jesuits." Mot. at 6. The 1951 Minutes, however, provide no evidence of a cover up, no evidence that the Province moved Father Toulouse to Seattle, no evidence that Father Toulouse sodomized anyone, and no evidence of the discipline the Province chose. J.C. states that the Consultors reviewed sexual misconduct claims as "a matter of routine," but the evidence shows at most six such incidents from 1943 to 1953, and none thereafter. Mot. at 6. J.C. also asserts, without evidence, that the existence of minutes of Consultors' meetings was "a closely guarded secret." Mot. at 9. J.C.'s motion is remarkable in that counsel shoehorned baseless allegations into almost every paragraph.[6] Only the court's distaste for continued discussion of the subject prevents it from further recounting counsel's improprieties.

---

[6] The lack of evidence supporting J.C.'s allegations of discovery abuse, coupled with a flotilla of recent articles in local newspapers concerning this action and other allegations of abuse against the Province, suggest an ulterior motive for this motion. Under ordinary circumstances, counsel's prancing for the press would be of no concern to the court. In this case, the number of newspaper articles that cite allegations in pleadings in this court, including articles that repeat the baseless allegations of discovery abuse contained in this motion, suggest that this motion serves in part as ammunition in a media campaign. The court reiterates that counsel and their clients will suffer severe consequences if the court finds that public relations considerations are trumping counsel's professional responsibilities. See supra n.4.

ORDER – 8

The court finds no reason to impose sanctions on the Province. J.C. should not have brought this motion against the Province. Only the court's displeasure with both parties' behavior in the press prevents the court from awarding sanctions against J.C. for bringing this motion. See supra n.4, n.6.

**B.    Allegations of Misconduct Against Seattle University**

In contrast to the empty accusations of wrongdoing on the Province's part, J.C.'s motion for sanctions against Seattle University contains proof of SU's counsel's misconduct. SU's counsel flagrantly obstructed the depositions of three SU witnesses, and did so with no basis.

On July 20, 2006, J.C.'s counsel deposed Father Steven Sundborg, a former official in the Province and the current SU President. Counsel showed Father Sundborg the letter from Father Lemieux to the Province stating that Father Toulouse "had to be got out of Spokane." Shaffer Decl., Ex. C. J.C.'s counsel asked Father Sundborg whether, hypothetically, an SU President would be in a position to object if the Province transferred a teacher to SU without his consent. SU's counsel responded as follows:

> Object to the form of the question; calls for speculation about an incident, apparently 1950 or earlier, about which this fact witness has no personal knowledge. It calls for a legal conclusion as posed.
>
> I'm not going to permit him to answer questions that are so clearly beyond the pale of his personal knowledge in this case and I'm going to seek a protective order. I'm not going to have him answer these kinds of speculative hypotheticals.

Sundborg Depo. at 42-43. J.C.'s counsel asked if counsel was instructing Father Sundborg not to answer. Id. at 43. SU's counsel responded: "Yes. We'll seek a protective order." Id.

Because counsel's response is typical of her conduct throughout Father Sundborg's deposition and in the depositions of other witnesses, the court will address it in detail.

ORDER – 9

The court notes at the outset that Federal Rule of Civil Procedure 30 ("Rule 30") governs conduct during a deposition.

Rule 30(d)(1) begins with the admonition that an "objection during a deposition must be stated concisely and in a non-argumentative and non-suggestive manner." Counsel's objection was not concise. It was not merely argumentative, it was obstreperous and obstructionist. It was also suggestive, because it improperly usurped the witness's obligation to testify regarding the extent of his personal knowledge.

The next sentence of Rule 30(d)(1) states that counsel "may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion under Rule 30(d)(4)." SU's counsel was neither protecting a privilege nor enforcing a limitation that this court imposed, and thus her objection was proper only if it she made it "to present a motion under Rule 30(d)(4)." Months have passed since Father Sundborg's deposition, and SU has presented no motion under Rule 30(d)(4). If SU had presented such a motion, it would have had to show that the "examination [was] being conducted in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the deponent." Fed. R. Civ. P. 30(d)(4). SU would have been unable to make the required showing, because there is no indication of bad faith or unreasonable conduct. J.C.'s counsel asked whether the current President of SU knew if a President of SU could object to the Province's placement of a professor at SU. This is a reasonable question. At most, counsel improperly phrased it as a hypothetical. At most, SU's counsel should have objected to the form of the question, then permitted Father Sundborg to answer it.

If SU's counsel had violated Rule 30 just once, the court might overlook it. In this case, however, counsel repeatedly instructed Father Sundborg not to answer questions. Sundborg Depo. at 43 (instructing witness not to answer before J.C.'s counsel had

ORDER – 10

finished his question), 48-49 (twice instructing witness not to answer because question allegedly called for a legal conclusion).

SU's counsel also prevented Father Sundborg from answering general questions about "manifestation of conscience," a form of confession from one priest to another. Id. at 34-37. While the content of communications made during a manifestation of conscience might be privileged, the questions that J.C.'s counsel asked did not seek the content of any communication. SU's counsel's refusal to permit Father Sundborg to answer the questions was therefore improper.

A month later, in an August 2006 deposition of Father Frank Costello, SU's counsel continued to violate Rule 30. Again, she instructed her witness not to answer questions merely because she objected to their form. See, e.g., Costello Dep. at 29, 30 (improperly instructing witness not to answer hypothetical questions). She again made hollow threats to seek a protective order. Id. at 30.

Finally, SU's counsel obstructed the September 2006 Rule 30(b)(6) deposition of Father Peter Ely. She repeatedly instructed Father Ely not to answer questions that she believed were beyond the scope of J.C.'s designation of topics under Rule 30(b)(6). See, e.g., Ely Depo. at 8-9, 10-11, 19-20, 22-25. The purpose of designating topics of inquiry to an entity under Rule 30(b)(6) is to allow the entity to locate and prepare a witness with the most knowledge regarding those topics. See Fed. R. Civ. P. 30(b)(6). If counsel strays from the designated topics during the deposition, the deponent is free to answer that he has no responsive knowledge. Indeed, on many occasions when SU's counsel permitted her witness to answer questions, Father Ely responded by stating that he had no knowledge. See, e.g., id. at 16, 17, 23, 24.

In addition to preventing Father Ely from answering questions, counsel's objections were needlessly argumentative. When J.C.'s counsel asked if she might

ORDER – 11

shorten her objections, she responded that she would not, and that counsel's questions were "defective for a variety of reasons that I think I need to spell out on the record and give you chance to correct them . . . ." Id. at 11; see also id. at 13 ("I am going to give you another chance or two, Counsel . . .".).

SU's counsel's conduct warrants sanctions. By necessity, the court does not supervise depositions. It relies on counsel to conduct them professionally and in compliance with applicable rules. Except when protecting a privilege, or in extraordinary circumstances not present here, counsel cannot prevent witnesses from answering questions. Instead, counsel must make their objections on the record and rely on the court to rule upon the objections if the parties use the deposition in later proceedings.

The court orders counsel for SU to pay half of J.C.'s costs and attorneys' fees for the depositions of Father Sundborg, Father Costello, and Father Ely. In addition, to the extent counsel's obstructionist conduct prevented J.C. from obtaining the information he sought in those depositions, SU shall make each witness available for a renewed deposition. SU's counsel shall be responsible for all costs and attorneys' fees associated with the renewed depositions.

J.C. shall use discretion in deciding whether to renew each witness's deposition. The record is silent as to whether counsel obtained the information they were seeking from other sources since the depositions. Counsel may not use the second depositions to open new lines of inquiry. The additional depositions are for the sole purpose of permitting J.C. to obtain information that SU's counsel improperly prevented him from obtaining. If J.C.'s counsel exceeds these boundaries, the court will impose sanctions.

**C.    Motions to Seal**

The Province has filed two motions (Dkt. ## 104, 109) to seal exhibits to two declarations from Michael Shaffer, one of J.C.'s attorneys. Mr. Shaffer filed the first

ORDER – 12

declaration (Dkt. # 99) on September 26, 2006, in support of J.C.'s opposition to a pending motion for summary judgment. Two days later, Mr. Shaffer filed his second declaration (Dkt. # 103), erroneously indicating that it also related to the pending summary judgment motion. The Province seeks to seal Exhibits A through K to the first declaration. The only exhibits that the Province wishes to seal in the second declaration are duplicates of the exhibits it seeks to seal in the first declaration. The court therefore focuses on the first declaration.

In this court, a party seeking to seal court records must make a "compelling showing" to overcome the "strong presumption of public access to the court's files and records. Local Rules W.D. Wash. CR 5(g)(1). The party must show that the "interests of the public and the parties in protecting files, records, or documents from public review" outweighs the presumptive right of access. Id. The court notes that J.C. did not file these documents under seal, and thus the public has had access to them since September 26.

The court previously ruled in this case that the interest in protecting the privacy of victims of sexual assault outweighs the right of the public to access such information. The court's review of the documents before it, however, shows that all victims' names have been sufficiently redacted to obscure their identities.

For the most part, the Province fails to make a particularized showing overcoming the presumed right of public access to the documents at issue. The Province repeatedly states that the documents reveal "internal operations of a religious entity and contain information of a sensitive nature." The court is aware of no "internal operations" exception to the presumed right of public access, and observes that such an exception would swallow the presumption in most cases. The court notes, moreover, that the Province makes no effort to explain why the internal operations of a "religious entity" deserve additional protection.

ORDER – 13

Exhibit A is a redacted version of the minutes of a 1938 meeting at which the Consultors questioned Father Toulouse's observance of "religious discipline." It contains no other names, and refers to no other matters. There is no reason to seal it.

Exhibit B is J.M.'s declaration. It is apparent that he submitted the declaration knowing that counsel would use it in this litigation. As counsel have redacted his name from the document, there is no basis for sealing it.

Exhibits C, D, and E are letters from Father Lemieux to Provincial officials. The letters are between 55 and 45 years old. They refer to Father Toulouse in cryptic fashion, and also discuss other priests within the Province. The court finds that the references to other priests pose little danger of invading their privacy, and the Province provides no basis for a contrary conclusion. The same is true of Exhibit F, a 1963 report on an official Provincial visit to SU, and Exhibit I, Father Small's November 1950 letter.

Exhibits G and H contain relatively recent notes of Provincial investigations into sexual abuse allegations. Most of the notes are marginally legible, and the court cannot determine whether they reveal information that it should shield from public view. Because the court is concerned that the notes may reveal too much identifying information about sexual abuse victims, the court will permit counsel to seal these documents. This ruling is without prejudice to the court revisiting the issue on a proper motion from either party.

Exhibit J is a redacted version of the 1951 Minutes. To the extent that the document discusses Father Toulouse, there is no basis for sealing it. The document also contains a discussion of sexual conduct between another priest and a "girl." Because this discussion may contain enough information to help reveal the identity of the "girl," the court directs the parties to redact the discussion.

ORDER – 14

Finally, Exhibit K contains minutes of a 1938 meeting of the Consultors in which they decided to move a priest accused of abusing boys to another city. The minutes reveal almost no information that would identify the victims, and thus there is no basis for sealing the document.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS the Province's motion (Dkt. # 102) to the extent it seeks sanctions against SU's counsel, and DENIES it in all other respects.[7] The court GRANTS the Province's motions to seal (Dkt. ## 104, 109) in part and DENIES them in part. The court directs the clerk to place Mr. Shaffer's declarations (Dkt. ## 99, 103) under seal. J.C. must file new versions of those declarations that comply with the court's discussion above. Finally, the court DENIES J.C.'s motion to file an overlength brief (Dkt. # 96) and his motion for an extension of time (Dkt. # 122) as moot. If J.C. files further overlength or untimely pleadings without leave of court, the court will strike them.

Trial in this action will commence on December 5, 2006.

Dated this 27th day of October, 2006.

JAMES L. ROBART
United States District Judge

---

[7] The court notes that both the Province and SU claim that J.C. failed to meet and confer with them before filing this motion, pursuant to Local Rules W.D. Wash. CR 37(a)(2)(A). For reasons that the court need not enumerate, it is not clear that CR 37(a)(2)(A) applies to the instant motion. Nonetheless, J.C.'s counsel would have benefitted from meeting and conferring with opposing counsel, because the communication might have discouraged J.C. from bringing his baseless allegations against the Province. The court therefore orders that counsel to meet and confer before bringing *any* further motions in this action.

ORDER – 15